# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| RANDALL R. L.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-CV-141-MGG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Randall R. L. seeks judicial review of the Social Security Commissioner's ("the Commissioner's") decision dated March 8, 2018, denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The undersigned may enter a ruling in this matter based on parties' consent pursuant to 28 U.S.C. § 636(c). [DE 17]. For the reasons detailed below, the Court **REVERSES AND REMANDS** the decision of the Commissioner for further consideration.

## I.    OVERVIEW OF THE CASE

Plaintiff is a prior sorter and waterproofing foreman who was 39 years old on the alleged disability onset date of December 31, 2007. "He has a high school education with some college but no degree." [DE 15 at 2]. Plaintiff allegedly suffers from "pain in

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the Court refers to the plaintiff by first name and last initial only.

both his hips, both his knees, his left lower leg, and his back." *Id.* On December 17, 2015, Plaintiff filed the instant DIB and SSI applications.

Plaintiff's applications were denied initially on February 18, 2016, and upon reconsideration on April 4, 2016. At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on August 2, 2017. Plaintiff, Plaintiff's representative, and an impartial vocational expert appeared at the hearing. Following the hearing, the ALJ issued an order dated March 8, 2018, finding Plaintiff not disabled as defined by the Social Security Act ("Act"). On January 31, 2019, the Appeals Council denied Plaintiff's request for review making the ALJ's March 2018 decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981; *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Now ripe before this Court is Plaintiff's complaint for judicial review of the Commissioner's March 2018 decision under 42 U.S.C. § 405(g).

## II.   Background

Plaintiff was born on March 21, 1968. He was 39 years old on the alleged date of disability. While Plaintiff has held various jobs in the past, he claims he was forced to quit working due to various ailments including, among others, a prior fractured left knee, damage to his back, hips and knees, and inability to sit, stand and lift normally. [DE 9 at 24]. Many of Plaintiff's alleged ailments are supported by medical imaging studies.

In 2015, a CT scan confirmed that Plaintiff was suffering from degenerative disc disease of the cervical spine. Later, in 2016, x-rays revealed, among other things, spondylosis of the lumbar spine and osteoarthritis of the bilateral hips and knees. Then,

in 2017, x-rays demonstrated degenerative changes in the knees, hips, and low back, along with osteoarthritis of the right hip. Moreover, a 2017 MRI revealed prominent osteoarthritis in the right hip and a 13 mm loose body in the right hip. Despite the various ailments depicted in the imaging studies, the ALJ determined that Plaintiff was not disabled. In coming to this determination, the ALJ expressly relied, in large part, on the opinions of certain medical consultants. However, these medical consultants did not have the benefit of reviewing all the imaging tests listed above.

On January 25, 2016, Dr. H.M. Bacchus, Jr. conducted a consultative examination of Plaintiff. Following this consultation, Dr. Bacchus opined that Plaintiff could perform work at the light exertional level. Dr. Bacchus' opinion largely paralleled that of State medical consultants, who believed Plaintiff "retained the capacity for light work . . . ." *Id.* at 25. The ALJ assigned "great weight" to the opinion of Dr. Bacchus and "some weight" to the opinions of State Agency medical consultants. *Id.* at 25–26. Ultimately, the ALJ determined that Plaintiff had the residual functional capacity to perform light work with certain, specified limitations.

At the August 2017 hearing before the ALJ, an impartial vocational expert relied on the residual functional capacity articulated by the ALJ and testified that an individual with Plaintiff's characteristics could perform in various occupations, such as router and office helper. Based on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform certain jobs and was not disabled.

III.   **DISABILITY STANDARD**

In order to qualify for DIB and SSI, a claimant must be "disabled" under Sections 216(i), 223(d), and 1615(a)(3)(A) of the Act. A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner's five-step inquiry in evaluating claims for DIB and SSI under the Act includes determinations as to: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant's impairments are severe; (3) whether any of the claimant's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404 to establish disability without further analysis; (4) whether the claimant can perform his past relevant work based upon her residual functional capacity; and (5) whether the claimant is capable of performing other work. 20 C.F.R. §§ 404.1520; 416.920[2]; *see also Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). The claimant bears the burden of proof at every step except Step Five. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

IV.   **STANDARD OF REVIEW**

This Court has authority to review a disability decision by the Commissioner pursuant to 42 U.S.C. § 405(g). However, this Court's role in reviewing Social Security

---

[2] Regulations governing applications for DIB and SSI are found in 20 C.F.R. Part 404 and Part 416, respectively. For the sake of clarity and efficiency, this order will refer only to 20 C.F.R. Part 404 because the regulations are functionally identical.

cases is limited. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). A court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts of evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004). The Court must uphold the ALJ's decision so long as it is supported by substantial evidence. *Thomas v. Colvin,* 745 F.3d 802, 806 (7th Cir. 2014) (citing *Similia v. Astrue,* 573 F.3d 503, 513 (7th Cir. 2009)). Substantial evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence is simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Summers v. Berryhill,* 864 F.3d 523, 526 (7th Cir. 2017); *Kepple v. Massanari,* 268 F.3d 513, 516 (7th Cir. 2001).

The deference afforded to the ALJ's decision is lessened where the ALJ's findings contain errors of fact or logic or fail to apply the correct legal standard. *Schomas v. Colvin,* 732 F.3d 702, 709 (7th Cir. 2013). Furthermore, an ALJ's decision cannot stand if it lacks evidentiary support or inadequately discusses the issues. *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). At a minimum, an ALJ must articulate his analysis of the record to allow the reviewing court to trace the path of his reasoning and to be assured the ALJ has considered the important evidence in the record. *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not required to address every piece of evidence in the record, but the ALJ must at least provide a glimpse into the reasoning behind his analysis to build the requisite "logical bridge"

from the evidence to the ALJ's conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). The ALJ is not permitted to "cherry-pick" facts from the record to support a finding of non-disability. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Further, an ALJ may not ignore an entire line of evidence contrary to his findings. *Zurawski v. Halter*, 243 F.3d 881, 888 (7th Cir. 2001). If the ALJ fails to build a logical bridge between the evidence and his conclusions, the case must be remanded. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## V. ANALYSIS

Plaintiff challenges two aspects of the ALJ's decision. First, Plaintiff contends that the ALJ failed to subject new imaging studies to medical expert scrutiny. Second, Plaintiff asserts that the ALJ failed to properly evaluate Plaintiff's testimony regarding his symptoms. Each argument is addressed in turn below.

### A. New Imaging Studies

Plaintiff first argues that the ALJ improperly evaluated imaging studies without consulting a medical professional. Specifically, Plaintiff points to two imaging studies, a 2017 x-ray and a 2017 MRI, that were never reviewed by the medical experts upon which the ALJ relied. According to Plaintiff, these two studies reveal "significant damage in the right hip"—an area that had not previously been imaged—and new findings of possible damage in the left knee. [DE 15 at 7]. Given the new findings, Plaintiff contends that the ALJ was required to subject the 2017 imaging studies to medical expert scrutiny.

It is well established that "an ALJ may not 'play[ ] doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (alteration in original) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)); *see also Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018); *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982). However, courts give ALJ's deference in deciding "how much evidence is sufficient to develop the record fully and what measures (including additional consultative examinations) are needed in order to accomplish that goal." *Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011). "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

In the instant case, contrary to the Plaintiff's suggestion, the ALJ did not attempt to "play doctor." Plaintiff cites various cases to buttress his argument that the ALJ improperly evaluated imaging studies without the assistance of medical experts. But most of the cases cited involve instances where an ALJ independently assessed, or attempted to interpret, imaging studies. In contrast, here, the ALJ did not make any specific conclusions about the imaging studies.

In support of his argument on this issue, Plaintiff cites *McHenry v. Berryhill* 911 F.3d 866 (7th Cir. 2018), and *Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018). In *McHenry*, the ALJ determined, without the aid of a medical expert, that an MRI was not consistent with the relevant medical record. *Id.* at 870. The ALJ therefore gave "no weight" to the MRI. *Id.* On appeal, the court determined that the "ALJ impermissibly

assessed the MRI report on his own without the assistance of a medical expert." *Id.* at 871. The court specifically noted that an ALJ "may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions." *Id.*

Similarly, in *Akin v. Berryhill*, the court found that the ALJ impermissibly played doctor when he concluded that the plaintiff's MRI results were consistent with the ALJ's assessment. 887 F.3d 314, 317 (7th Cir. 2018). The court noted that the ALJ had "many options" besides improperly assessing the MRI results, one of which would have been to seek an updated medical opinion. *Id.* at 318. Finding that the ALJ failed to seek an updated medical opinion, the court concluded that the ALJ acted in error.

Here, the record shows that the ALJ did not attempt to interpret either of the 2017 imaging studies that Plaintiff relies on to support his argument. Unlike *McHenry* and *Akin*, where the ALJs made consistency determinations regarding imaging tests, here the ALJ did not make any such conclusions. In fact, the ALJ did not directly address the imaging studies at all except to note their existence.[3] Accordingly, neither *McHenry* nor *Akin* control the outcome of this case. However, Plaintiff's reliance on *Goins v. Colvin* , 764 F.3d 677 (7th Cir. 2014), is more persuasive.

In *Goins*, the Seventh Circuit had to determine whether the ALJ gave sound reasons for denying the plaintiff's application for SSI. *Id.* The *Goins* ALJ supported his decision with, among other things, the conclusions of two consulting physicians. *Id.* at

---

[3] In his decision, the ALJ listed the various imaging studies that had been conducted. [DE 9 at 25]. However, the ALJ seemingly misidentified the September 2017 MRI, calling it a "September 2017 x-ray . . . ." *Id.* (ALJ citing 16F/5, which pertains to the MRI results).

680. However, the consulting physicians had not been shown the report of the plaintiff's most recent MRI, which indicated that the plaintiff was suffering from Chiari I—"a condition in which brain tissue extends into the spinal canal." *Id.* at 679. In remanding the case, the court held that the ALJ erred by not obtaining a medical report of the latest MRI, which demonstrated "new and potentially decisive medical evidence." *Id.* at 680. Importantly, the court noted the ALJ uncritically accepted the consulting physicians' conclusions, even though such physicians had not been shown the most recent MRI. *Id.* The court also criticized the ALJ's decision because it merely "summarized the results of the [most recent] MRI . . . while ignoring the Chiari I malformation." *Id.*

Here, while many of the imaging studies took place before Dr. Bacchus examined Plaintiff, some did not. Similarly, several imaging studies were conducted after State medical consultants reviewed Plaintiff's medical record. This situation resembles *Goins* in that the ALJ appears to have relied uncritically on a consultative report even though the consultative physician had not been privy to the latest imaging studies. However, unlike *Goins* where the court had no trouble determining that the unreviewed medical condition—in that case Chiari I—represented new and potentially decisive medical information, Plaintiff's case is not so clear-cut.

Plaintiff's latest x-ray and MRI studies revealed various conditions, including degenerative changes of the knees, effusion in the knee, asymmetric-increased lucency in the knee, prominent osteoarthritis of the right hip, and a 13 mm loose body in the right hip joint. *Id.* at 682–84, 690–91. Many of these findings were not present in prior imaging studies. *See, e.g.*, DE 9 at 520 (x-ray findings explicitly stating "[n]o joint

effusion"). While these additional findings do not sound nearly as serious as Chiari I—the condition the *Goins* court found to be new and potentially decisive medical evidence—they do sound serious enough as to require review by a medical professional. Indeed, having a 13 mm loose body in one's hip "is not the equivalent of having a runny nose or an ingrown toenail." *Goins*, 764 F.3d at 680. Accordingly, if the new imaging studies were not subjected to medical expert scrutiny—as Plaintiff suggests—then *Goins* would be dispositive, and the case would need to be remanded. However, the Commissioner contends that the new imaging studies were subjected to review by medical professionals despite Plaintiff's arguments to the contrary.

The Commissioner states that pain management providers did review the 2017 x-ray. Specifically, the Commissioner cites to a medical report dated August 25, 2017, where a nurse practitioner states that the 2017 x-rays had been reviewed. [*See* DE 9 at 705; DE 18 at 10]. The Commissioner argues that since the pain management providers did not change Plaintiff's treatment after reviewing the 2017 x-ray, the findings in the new x-rays were not potentially decisive medical evidence. Likewise, the Commissioner notes that the purpose of the 2017 MRI was to determine if there was avascular necrosis, also known as osteonecrosis. Accordingly, the Commissioner contends that since the MRI revealed no specific evidence of osteonecrosis, the MRI findings were not potentially decisive medical evidence.

The Commissioner is correct in noting that the treatment providers did review the latest x-rays in their treatment of Plaintiff. *See, e.g.*, DE 9 at 710 (pain treatment provider noting that she "[r]eviewed x-rays of hips and knee"). The fact that the

treatment providers continued to conservatively treat Plaintiff following the review of the 2017 x-ray, as noted by the ALJ, *see id.* at 25, supports the Commissioner's conclusion that the 2017 x-ray findings were not potentially decisive medical evidence. Yet, significantly, there is no indication in the record that the pain treatment providers reviewed the 2017 MRI. While the MRI did not reveal avascular necrosis—the condition that the pain treatment providers thought necessitated the MRI—the MRI did reveal other potentially serious ailments, such as the 13mm loose body in the right hip joint. Contrary to the Commissioner's suggestion, it would not make sense to ignore the ailments revealed in the MRI merely because they were not the ailments that the medical provider thought necessitated the MRI in the first place. The 2017 MRI's findings "may corroborate [Plaintiff's] complaints, or they may lend support to the ALJ's original interpretation," but either way the new imaging study should have been subjected to scrutiny by a medical professional. *Akin*, 887 F.3d at 317.

Additionally, there is another flaw in the ALJ's decision. The ALJ appears to have merely "summarized the results of the" 2017 x-rays and MRI "while ignoring" some of the findings from them *See Goins*, 764 F.3d at 680. For example, the ALJ summarized the 2017 x-ray findings by stating that they showed "degenerative changes in the knees, hips, and low back" and "osteoarthritis of the right hip . . . ." [DE 9 at 25]. However, the ALJ's opinion completely ignores other new findings, such as the asymmetric increased lucency in the left tibia that was revealed in a 2017 x-ray and the 13 mm loose body in the right hip that was revealed in the 2017 MRI. Regardless of whether these new findings alter the ALJ's conclusion, they have the potential to do so

and therefore must be accounted for. Indeed, an ALJ is not free to ignore medical problems that may be causing a claimant's alleged symptoms even though he is not required to recite every piece of evidence. *Goins*, 764 F.3d at 680.

In sum, the new imaging studies, particularly the 2017 MRI, represent potentially decisive medical evidence that must be subjected to scrutiny by a medical professional. However, this finding rests of very narrow grounds. To be sure, the "logical bridge" from the evidence in the record to the ALJ's conclusions was nearly built. *See Craft*, 539 F.3d at 673. The only unconnected part of the bridge was the unaccounted-for MRI. And the ALJ's failure to secure a medical opinion regarding the 2017 MRI leaves the ALJ's opinion unsupported by substantial evidence. Therefore, the ALJ's opinion is remanded for further consideration.

### B.    Evaluation of Plaintiff's Testimony

Plaintiff also asserts that the ALJ improperly evaluated Plaintiff's subjective symptom testimony. ALJs evaluate an individual's subjective symptom testimony using a two-step process. *See* 20 C.F.R. § 404.1529; SSR 16-3p. First, the ALJ determines whether objective medical evidence shows a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged. *See* 20 C.F.R. § 404.1529(b); SSR 16-3p. If such an impairment exists, then the ALJ evaluates the intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities. 20 C.F.R. § 404.1529(c); SSR 16-3p. "In determining the ability of the claimant to perform work-related activities, the ALJ must consider the entire case record, and the

decision must contain specific reasons for the finding." *Pittenger v. Berryhill*, No. 2:17-CV-230, 2018 WL 4026291, at *4 (N.D. Ind. Aug. 23, 2018).

Courts will "overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)); *see also Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (such determinations "may be overturned only if [they are] 'patently wrong'") (quoting *Craft*, 539 F.3d at 678). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong,' and deserving of reversal." *Elder*, 529 F.3d at 413–14 (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Cullinan*, 878 F.3d at 603.

In the instant case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms. However, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the record. The ALJ gave various reasons for his finding, four of which are challenged by Plaintiff. These are: (1) that Plaintiff was not compliant with his prescribed medical regime; (2) that Plaintiff had failed to follow through and schedule appointments with an orthopedic and joint specialist; (3) that no doctor had recommended surgical intervention for Plaintiff; and (4) that Plaintiff's doctors occasionally refused to refill his

narcotic prescriptions because he failed urine drug screens. [DE 15 at 8]. Plaintiff

contends that these four reasons are not supported by substantial evidence.

### 1.    Medication Regime

In discussing Plaintiff's subjective symptoms, the ALJ stated that Plaintiff had

not been fully compliant with his prescribed medication regime. In support, the ALJ

cited various medical documents, including a February 2016 treatment record where

Plaintiff received a cortisone injection in his left knee, a May 2016 treatment record

where Plaintiff declined a hip injection, and a January 2017 treatment record where

Plaintiff complained that he had been out of his medications for a few months. But the

ALJ did not, however, specify which parts of the documents supported his assertion.

The Commissioner hypothesizes that the ALJ appeared to be "referring to either or both

Plaintiff's declining of a hip injection, or an apparent gap in treatment from May 2016 . .

. and January 2017." [DE 18 at 13]. In any event, Plaintiff alleges that the ALJ erred by

drawing an adverse inference from Plaintiff's failure to take medications without asking

him why he was not taking them.

While "infrequent treatment or failure to follow a treatment plan can support an

adverse credibility finding . . . the ALJ 'must not draw any inferences' about a

claimant's condition from this failure unless the ALJ has explored the claimant's

explanations . . . ." *Craft,* 539 F.3d at 679 (citing SSR 96–7p). Here, the ALJ seemingly

drew a negative inference from Plaintiff's failure to fully comply with his medication

regime. *See* DE 9 at 25. Indeed, the ALJ explicitly noted Plaintiff had "not been

compliant" in taking his medications. *Id.* Although the ALJ did not explain how

Plaintiff failed to comply with his medications, the citations provide some context for the inference.

For example, the cited documents show that Plaintiff refused a hip injection because he did not like needles, despite having previously received an injection in his knee that he said was "helpful." *Id.* at 546. Similarly, a treatment report dated May 23, 2016, from Dr. Thomas G. Myers shows Plaintiff requesting a refill of his pain medications even though his appointment with a pain specialist was only a few days away. *Id.* at 544. Moreover, in January 2017, Plaintiff requested another refill of his prescription medications because he had been "out of all [his] medications for a few months[,]" suggesting there may have been a gap in treatment. *Id.* at 633. While all these situations may give rise to the seemingly negative inference that was drawn, the ALJ did not directly ask Plaintiff any questions about his medication regime at the August 2, 2017, hearing. But Plaintiff's attorney did.

When counsel asked Plaintiff about his pain medication at the August 2017 hearing, Plaintiff testified that he decreased his usage of such medication to avoid becoming dependent on pills. *Id.* at 178. This statement seems to contradict Plaintiff's May 2016 and January 2017 requests for refills of his pain medication. Thus, the ALJ's inference reasonably could have followed from the inconsistency between Plaintiff's hearing testimony and the May 2016 and January 2017 treatment records. Therefore, the ALJ's apparent negative inference challenged by Plaintiff is supported by substantial evidence and is not "patently wrong" even if the ALJ's reasoning was inartfully presented in his decision. *See Elder*, 529 F.3d at 413–14; *see also* SSR 16-3p (noting that the

ALJ "will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances").

One more argument needs to be addressed. In his Reply, Plaintiff challenges the above argument, and others posited by the Commissioner, as being an improper post hoc rationalization. While it is true that the ALJ—not the Commissioner's lawyers—must be the one to "articulate the grounds for her decision," the ALJ's assertions combined with the citations specified provide enough support for the Court to uphold the inference that was drawn. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

## 2.    Scheduling Appointments

The ALJ also noted that Plaintiff failed to schedule consultations with orthopedic and joint specialists, despite referrals to do so. In support of this statement, the ALJ cited three medical records. [DE 9 at 25]. The first included a February 8, 2016, referral to orthopedic surgery. The second included a March 16, 2016, referral for a left hip consultation. This document also noted that Plaintiff had yet to schedule an appointment with his joint specialist despite suggestions to do so. The third included a May 8, 2017, referral to orthopedic surgery. Plaintiff once again argues that the ALJ improperly drew an adverse inference from Plaintiff's failure to follow through with treatment without exploring his reasons. Assuming a negative inference was drawn, which is not entirely clear, the Court agrees with Plaintiff's conclusion.

As noted above, the ALJ must explore the reasons a treatment plan was not followed before drawing any adverse inferences about the failure to follow that plan.

*See Craft,* 539 F.3d at 679; *see also* SSR 16-3p (stating that adjudicators "will not find an individual's symptoms inconsistent with the evidence in the record . . . without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints" and noting that adjudicators "will *consider and address* reasons for not pursuing treatment that are pertinent to an individual's case") (emphasis added). Accordingly, the ALJ "may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints." *Id.*

At the 2017 hearing, the ALJ did not ask Plaintiff why he failed to schedule the recommended consultations. Likewise, Plaintiff's attorney did not directly explore the issue. Therefore, since Plaintiff was never asked why he failed to schedule treatment, any negative inference relating to Plaintiff's failure to schedule treatment is not supported by substantial evidence and is precluded. *See Craft,* 539 F.3d at 679. Accordingly, on remand the ALJ must not draw any adverse inference from Plaintiff's failure to schedule consultations unless the ALJ considers and addresses Plaintiff's reasons for not scheduling the consultations. *See* SSR 16-3p.

### 3.   Surgical Intervention

In his order, the ALJ stated that "no doctor ha[d] recommended surgical intervention for" Plaintiff. [DE 9 at 25]. The ALJ did not cite any medical records in support of his assertion. Plaintiff argues that the ALJ was mistaken and that the file is "replete with treatment notes referring to surgery." [DE 15 at 10]. While the

Commissioner agrees that there is some discussion of surgery in the record, it contends that any surgical treatment notes only referred to consultation for possible surgery, not plans for direct surgery. In reply, Plaintiff acknowledges that a consultation for surgery may be required prior to any actual procedure, but he contends that the ALJ still erred by allegedly discounting his subjective symptom testimony on account that no surgery had been recommended. Plaintiff's argument has merit.

As previously noted, the ALJ found that Plaintiff's statements concerning his symptoms were not consistent with the medical evidence in the record. One basis the ALJ used to justify this finding was that no doctor had recommended surgical intervention for Plaintiff. However, the ALJ made no effort to reconcile this basis with the record, which reveals that surgical intervention—or possible surgical intervention—had been recommended for Plaintiff.

The references to surgery in the record are many. For example: a February 2016 treatment record discusses the viability of a possible knee replacement [DE 9 at 555]; a May 2016 treatment document noted that Plaintiff was going to be sent to Indianapolis for consultation for possible surgery [*Id.* at 544]; an April 2016 treatment record stated that Plaintiff "is ready to have surgery on the left knee" [*Id.* at 547]; and a March 2017 treatment record recognized that Plaintiff had been "recommended for surgery but [he] was incarcerated" [*Id.* at 666]. Considering the overwhelming evidence to the contrary, the ALJ's statement that "no doctor has recommended surgical intervention for the claimant" fails to provide any support for the logical bridge needed to sustain the ALJ's decision. *Id.* at 25; *see Craft*, 539 F.3d at 673 (the ALJ must "build the requisite 'logical

bridge' from the evidence to the ALJ's conclusions"). Therefore, discounting Plaintiff's subjective symptom testimony on account that surgery had not been recommended does not find support in the record.

While not explicitly argued by the parties, it should be noted that Plaintiff may have had reasons for any failure to follow through with surgery. *See, e.g.*, DE 9 at 666 (noting that Plaintiff had been recommended for surgery but was incarcerated); *id.* at 191 (Plaintiff stating that he was trying to have his knee replacement surgery moved to Fort Wayne because he did not have transportation to Indianapolis). For this reason, drawing an adverse inference on account that Plaintiff has failed to schedule surgery would also be improper absent exploration and explanation. *See, e.g.*, *Craft,* 539 F.3d at 679; SSR 16-3p (quoted above).

Lastly, while the Commissioner may be correct that the ALJ's assertion regarding surgical intervention does not require remand on its own, the Court need not consider this argument since the case is being remanded on other grounds.

### 4.    Drug Screens

In discussing why Plaintiff's statements concerning his symptoms were not consistent with the record, the ALJ noted that Plaintiff's doctors had refused to refill his narcotic prescriptions because Plaintiff failed urine drug screens. In support of this assertion, the ALJ cited various documents showing that Plaintiff had repeatedly tested positive for marijuana and alcohol. Plaintiff argues that discounting his subjective symptom testimony on account of his drug use was improper because the narcotic pain medication that had been withheld was not "very effective in alleviating his pain." [DE

15 at 11]. In response, the Commissioner contends that Plaintiff's susceptibility to pain medication goes to the weight of the evidence and is not a proper basis for remand. The Commissioner is correct.

The ALJ's statement—that Plaintiff had failed numerous urine drug screens—finds ample support in the record. For example, a treatment record dated March 28, 2017, reveals that Plaintiff reported using marijuana. [DE 9 at 666]. Then, in both May and July 2017, Plaintiff tested positive for marijuana. [*Id.* at 653, 724]. Finally, in August 2017, a treatment document stated that Plaintiff tested positive for alcohol and was given his "3rd and final discussion" regarding alcohol use. [*Id.* at 710]. All these instances were cited by the ALJ. [*Id.* at 25]. Clearly, the ALJ's assertion regarding drug use finds ample support in the record and is not patently wrong. *See Elder,* 529 F.3d at 413–14 (noting that it is only when an ALJ's determination lacks explanation or support that it will be patently wrong).

In his reply, Plaintiff argues that the ALJ selectively reviewed the evidence. While an ALJ cannot "cherry-pick" facts from the record to support a finding, *Denton,* 596 F.3d at 425, he need not "address every piece of evidence in the record . . . ." *Craft,* 539 F.3d at 673. Here, the ALJ did not cherry-pick facts from the record. Rather, he merely noted that Plaintiff's narcotic prescription refills had been refused on account of Plaintiff's drug use. He then methodically cited several documents where Plaintiff had failed his urine drug screens. While there was some evidence in the record suggesting that narcotic medications were not completely effective at treating Plaintiff's pain, there is also evidence to the contrary. [*See, e.g.*, DE 9 at 177 (Plaintiff acknowledging that

Percocet "would do a little" and "relax" him)]. Indeed, even Plaintiff's attorney acknowledged that "[o]n two (2) clinical visits [Plaintiff] reported that the narcotic pain medications were helping . . . ." In any event, the ALJ was not required to specifically address each piece of conflicting evidence, and the Court will not accept the invitation to re-weigh the evidence or resolve conflicts of evidence. *See Young*, 362 F.3d at 1001. For the reasons stated, the ALJ unerringly considered the failed drug screens when evaluating Plaintiff's subjective symptom testimony.

## III.  CONCLUSION

For the reasons stated above, the ALJ erred by failing to subject new and potentially decisive medical evidence to medical scrutiny. Accordingly, the ALJ's decision denying Plaintiff's application for DIB and SSI is not supported by substantial evidence and must be **REVERSED AND REMANDED** for further consideration. Further, the undersigned **NOTES** that while not all of Plaintiff's arguments regarding his subjective symptom testimony were well founded, care must be taken on remand to fully consider and address the issues consistent with this opinion. The Clerk is **DIRECTED** to terminate the case in favor of Plaintiff.

**SO ORDERED** this 23rd day of February 2021.


s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge